*82 OPINION.
Arundell:
It is clear from the evidence that the petitioner was not engaged in trading as a principal. It is equally evident, and we have so found as a fact, that Corman, who never held less than 96 per cent of the petitioner’s capital stock, was the principal stock *83 holder and was regularly engaged in the active conduct of the affairs of the corporation. The elimination of these requirements of the statute in favor of the petitioner leaves for our consideration and determination the two remaining questions of (1) whether capital, invested or borrowed, is a material income-producing factor, and (2) whether the income of the petitioner is to be ascribed primarily to the activities of its principal stockholders.
Although the respondent appears to have disallowed personal service classification on the ground that capital was a- material income-producing factor, we have found no difficulty in reaching a contrary conclusion from the evidence submitted.
The only cash paid in for stock was $15,000, the balance of the capital stock of $35,000 having been issued for alleged good will. In 1920 the petitioner had a surplus of $3,603.82, and in 1921, $12,-808.39. Of the total of these amounts, there was invested in furniture and office equipment, improvements and Liberty bonds, the sum of $4,327.33 in 1919, $8,952.15 in 19$), and $12,768.87 in 1921, leaving the amounts of $10,672.67, $9,651.67, and $15,039.52 .in the corporation during the respective years available for transacting business.
Notwithstanding the small cash capital investment and the large amount of advertising handled each year, and the other business transacted, which in 1920 exceeded a million dollars, the petitioner was able to conduct its affairs without the use of borrowed money. This was possible because of its ability to collect amounts due from clients before the cash discount maturity date of the publisher’s bill, thereby enabling ,it to pay these bills with funds provided by the client. The record does not show whether the petitioner was legally liable to the publisher for his advertising charges, but the question is immaterial here since all of such bills, with a few possible exceptions, were paid by the client before the due date of the publisher’s invoice. As we said in Botsford-Constantine & Tyler, 10 B. T. A. 565, “ The actual method of operation and not the theoretical or legal liability is what controls.” See S. A. Conover Co., 6 B. T. A. 679, and F. Wallis Armstrong Co. v. McCaughn, 21 Fed. (2d) 636.
As to the other requirement of the statute, that of whether the corporation’s income is to be ascribed primarily to the activities of the principal stockholder, we find an abundance of evidence to sustain the claim of the petitioner. After a client had contracted to place his advertising through the petitioner. Corman, the principal stockholder, with the assistance of a few employees o,f his selection, proceeded to make an investigation into the particular marketing problems of the client, and after a plan of operation had been *84 agreed to, to prepare the necessary advertisements and arrange, in the name of the advertiser, for space in publications acceptable to the client for the running of advertisements. For the completion of art work necessary in connection with the manufacture by others of a plate for the advertisement, the xietitioner employed outside artists and charged the advertiser 15 per cent of the cost to it. A similar situation existed in other proceedings wherein we held that that fact was not fatal to the claim being made if the petitioner met the other requirements of the statute. See Botsford-Constantine & Tyler, supra; Honig-Cooper Co., 11 B. T. A. 896, and Mitchell Advertising Agency, Inc., 10 B. T. A. 1311. The commissions received on art work never exceeded about 7 per cent of the petitioner’s gross income and in 1921 were approximately 4 per cent. Substantially all of the petitioner’s gross revenue was derived by way of commissions and fees for preparing and placing advertisements and work incidental thereto. The percentage to gijpss income approximated 90 per cent in 1919, 92 per cent in 1920, and 93 per cent in 1921. The interest received on Liberty bonds never amounted to one-half of 1 per cent of gross income.
Gorman was the only solicitor of the petitioner and actually obtained all of its clients excepting those whose billings each year were less than $25,000. The balance of the clients were obtained by employees or came to the petitioner unsolicited. The petitioner did not trade in the sale of advertising space and did not reserve space until after a particular publication had been approved by the advertiser. The only thing it had for sale, and did sell, was its services. Gorman was the only person connected with the corporation who had had experience in all branches of advertising work and it was due to his qualifications to successfully carry out a publicity campaign that the petitioner obtained its business in the first instance and it was to him, rather than petitioner’s employees, that clients looked fox-results. The employees merely carried out ideas formulated by and under the direction of Gorman. While they may have produced some of the petitioner’s income the statute did not require that all the income be traceable to the principal stockholders. It is sufficient if the income is primarily due to their activities. We are satisfied from all the evidence before us in this proceeding that the income of the petitioner is to be ascribed primarily to the activities of Gor-man, the principal stockholder.

Judgment will he entered for the petitioner.